# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **DICKENSON-RUSSELL COAL COMPANY, LLC,** ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> **INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, ET AL.,** ) <br> ) <br> ) <br> ) <br> Defendants. ) | Case No. 2:11CV00023 <br><br> **OPINION** <br><br> By: James P. Jones <br> United States District Judge |

*Gregory B. Robertson, Ryan A. Glasgow, Sarah E. Bruscia, Hunton & Williams LLP, Richmond, Virginia, for Plaintiff. Arthur Traynor, United Mine Workers of America, Triangle, Virginia, for Defendants.*

The issue in this case is the enforceability of a labor arbitrator's award that directed reinstatement of a coal mine employee who was fired under a "zero-tolerance" drug policy after testing positive for marijuana use. The arbitrator found mitigating circumstances, including that the long-time employee had no prior history of illegal drug use. Because the drug policy did not require termination as the only possible punishment and reinstatement does not violate public policy, I will uphold the award.

I

Dickenson-Russell Coal Company, LLC ("Dickenson-Russell") filed this action pursuant to section 301 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185 (West 1998), seeking to overturn a labor arbitration award that reinstated its employee Robert Gilbert. The International Union, United Mine Workers of America (the "Union") filed a Counterclaim seeking enforcement of the award.[1] The Union also seeks attorneys' fees and prejudgment interest on Gilbert's lost wages. The parties have filed cross motions for summary judgment, which have been fully briefed and are ripe for decision.

The record of the proceedings before the arbitrator has been filed.[2] That record shows the following uncontested facts.

Dickenson-Russell is a corporation engaged in the business of mining coal. It operates the Cherokee Mine located in this judicial district. Dickenson-Russell and the Union are parties to a collective bargaining agreement called the 2010 New Virginia Operations Wage Agreement (the "Wage Agreement"). The Wage Agreement vests control of "[t]he management of the mine, the direction of the

---

[1] There is an additional party, Local Union 7170, District 17, United Mine Workers of America, which has an interest identical to that of the International Union. Both parties will be collectively referred to as the Union.

[2] The record consists of the transcript of the hearing before the arbitrator ("Tr."), the exhibits introduced at the hearing ("Ex."), and the arbitrator's Opinion and Award ("Award") and Supplemental Opinion and Award ("Suppl. Award").

working force and the right to hire and discharge" exclusively with Dickenson-Russell. (Ex. 1 at 4.) However, any discharge must be supported by just cause. (*Id.* at 146.) Discharges are subject to final arbitration (*id.* at 148) and the burden is on Dickenson-Russell to establish grounds for the discharge (*id.* at 146).

Dickenson-Russell adopted a written Drug and Substance Abuse Policy for UMWA Represented Employees (the "Drug Policy") in 2006. The Drug Policy notes the hazardous nature of the coal mining industry and explains that an employee "who comes to work after using drugs or alcohol, or is impaired by drugs and alcohol while on the job" poses a danger to themselves and their co-workers. (Ex. 2 at 1.) The Drug Policy states that Dickenson-Russell has

> <u>zero tolerance</u> for the use, consumption, being under the influence of, manufacture, possession, sale, distribution, or transfer of alcohol, mind or behavior altering substances, illegal Controlled Substances, the possession of associated paraphernalia or the misuse of prescription drugs.

(*Id.* (emphasis in original).) The Drug Policy also provides for random drug testing and states that a positive test above or equal to the "cut-off levels" set forth establishes a "conclusive presumption that the Employee reported to work impaired and in an unfit condition and/or under the influence of drugs or alcohol." (*Id.* at 4 (underlining omitted).) Further, the Drug Policy makes no distinction between passive or secondhand inhalation of marijuana smoke and warns employees that marijuana can be detected 30 or more days after use. Finally, the

Drug Policy states that a positive finding shall subject the employee "to disciplinary action, up to and including suspension with intent to discharge." (*Id.* at 7.)

After the Drug Policy went into effect and prior to Gilbert's termination, three employees at the Cherokee Mine tested positive for drugs and each was terminated.[3]  The Union did not arbitrate any of these terminations.[4]

Gilbert has worked in the coal industry for 32 years and started at Dickenson-Russell in 2003.  He was supervised by Mine Superintendent Michael Ohlson, for whom he had previously worked at another mine.  His work involved electrical and mechanical repair and was "safety sensitive." (Award 8.)  He had no prior disciplinary record.  He was aware of the Drug Policy.

On September 23, 2010, Gilbert was playing poker with two friends when one of them produced a marijuana cigarette.  Although he had not smoked marijuana since high school, Gilbert "toked it" twice.[5]  (Tr. at 56.)  After the poker

---

[3] Two employees tested positive for marijuana and the third for prescription drugs.

[4] The Union did challenge the discharge of an employee of Dickenson-Russell at another facility for a positive drug test under the same Drug Policy at issue here.  The matter went to arbitration and the arbitrator ordered the employee reinstated.  Dickenson-Russell then filed suit in this court asking that the award be set aside, *Dickenson-Russell Coal Co. v. Int'l Union, United Mine Workers,* No. 2:10CV00004 (W.D. Va. Jan. 15, 2010), but later dismissed the action pursuant to a settlement.

[5] A "toke" is a puff on a marijuana cigarette or pipe.  Merriam-Webster Dictionary, www.Merriam-Webster.com/dictionary/toke (last visited Jan. 2, 2012); *see*

game, Gilbert went home and went to bed.  As his luck would have it, at work the next day, September 24, 2010, Gilbert was subjected to a random drug test, his fourth such test that year.  This time he failed, testing positive for cannabinoids.[6]  Gilbert was suspended with the intent to discharge and, pursuant to Virginia law, Dickenson-Russell reported the positive test to the Virginia Department of Mines, Minerals and Energy and Gilbert's mine certifications were suspended.[7]  Gilbert grieved the decision but after two additional meetings, the company management decided to uphold it and Gilbert was fired.

The Union disputed Gilbert's discharge and an arbitration hearing pursuant to the Wage Agreement was held on February 7, 2011, before arbitrator M. David Vaughn.  In a lengthy written decision dated April 7, 2011, the arbitrator found that Dickenson-Russell's rules of conduct, including the Drug Policy, were reasonable.  He further found that although Dickenson-Russell had just cause to discipline Gilbert, it did not have such cause to terminate him.  The arbitrator reasoned that

---

Michael Brewer and Tom Shipley, "One Toke Over the Line" (Talking Beaver/BMI) (1970).

[6]  The Drug Policy states that the "cut-off level" for cannabinoids (substances found in cannabis or marijuana) is 50 nanograms per milliliter ("ng/ml").  (Ex. 2 at 6.)  The laboratory report of Gilbert's drug test states that the sample had a "quantitative level" of only 35 ng/ml.  (Ex. 6.)  However, as the arbitrator pointed out, the cut-off level of the Drug Policy may apply only to a screening test and not to a confirmatory test such as reflected in the laboratory report.  In any event, the parties do not dispute that Gilbert violated the Drug Policy.

[7]  Gilbert's certifications were reinstated by the State after he passed two additional drug screens in December of 2010.

although Gilbert clearly violated the Drug Policy, that policy provides that an employee who violates it will be subject "to disciplinary action up to and including suspension with intent to discharge," which language does not require termination for every violation.

Although the arbitrator considered Dickenson-Russell's argument that its past practice of termination informed the meaning of the "zero-tolerance" Drug Policy, he concluded that the "up to and including" language of the policy was clear and unambiguous. He further found that just cause required Dickenson-Russell to consider mitigating circumstances. The arbitrator then reviewed the evidence and concluded that consideration of the mitigating circumstances required a punishment other than termination.

> As the arbitrator wrote,
>
> I take note of the fact that eight years of service – with an absolutely clean work record – is not inconsequential. However, I also take note of the fact that Grievant's work history also includes years of work with Superintendent Ohlson at Jewell Ridge. There is nothing in the record to indicate that their prior interactions, and Grievant's employment record, were anything but positive.
>
> Although it is undisputed that mining is a hazardous occupation and that the Company's zero tolerance Drug Policy serves to reduce potential hazards, I also take note of the fact that Grievant testified, without contradiction, that he only took two puffs of the marijuana cigarette, that he had not used marijuana since he was in high school, that many hours passed between his drug use and his work at the mine and that he took and passed many drug tests prior to September 24, 2010, and a number of tests subsequently. In addition, I take note of the fact that the Board of Coal Mining Examiners – which is also

>charged with maintaining the safety of mine operations in Virginia – decided to reinstate Grievant's miner certifications. This occurred after subjecting Grievant – unbeknownst to him in advance – to two additional drug tests. Those tests not only confirmed an absence of marijuana metabolites in Grievant's system, but the other tests confirmed that he had not been a chronic user. Those tests support Grievant's testimony that his marijuana use was a one-time event.
>
>. . . .
>
>The Employer had just cause to discipline Grievant. However, Grievant is the "poster boy" for mitigating factors that support a penalty less than discharge. Indeed, if the mitigating circumstances attached to Grievant are insufficient to justify a penalty less than discharge, then there is likely no possibility that mitigating circumstances would ever be sufficient to do so. That is exactly what the Company contends. But that is not just cause. Consideration of mitigating circumstances in assessing the propriety of penalties is an element of just cause. ARB Decision No. 74-34 grants me the right to mitigate penalties and, through Article XXIII, Section (k), of the Agreement, the Parties bestowed that right to arbitrators. Consideration of those factors requires a reduction in the penalty assessed. The Award so reflects.

(Award 25-26, 29.)

The Award directed that Gilbert's termination be rescinded and he be reinstated to his former position but receive no back pay, finding that his suspension of approximately six months was for just cause. In the Award, the arbitrator retained jurisdiction over the dispute for 60 days "for the limited purpose of resolving disputes resulting from implementation of the Award." (Award at 30.)

Dickenson-Russell refused to implement the Award. On June 5, 2011, four days after Dickenson-Russell filed its Complaint in this case, the arbitrator issued a

Supplemental Opinion and Award. He noted that this court had not stayed the implementation of the Award nor otherwise divested him of jurisdiction and directed that Gilbert be paid "back pay and wages" from April 11, 2011, through the date of his reinstatement. (Suppl. Award 2.)

Dickenson-Russell continues to refuse to reinstate Gilbert or pay him back wages.

## II

Where there are no material facts in dispute, the court is justified in entering summary judgment to the party entitled thereto. Fed. R. Civ. P. 56(a).

While judicial review of the decisions of labor arbitrators is permitted under section 301 of the Labor Management Relations Act of 1947, it is limited under the principles set forth in the *Steelworkers Trilogy* (*United Steelworkers v. Am Mfg. Co.*, 363 U.S. 564 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); and *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960)). These cases established that judicial rulings must not undermine the federal policy of settling labor disputes by arbitration. *See Enterprise Wheel*, 363 U.S. at 596. When the parties have bargained for the arbitrator's interpretation of the labor contract, the court must defer to that interpretation, even if the court's interpretation is different. *See id.* at 599.

Further, a court will not review claims of factual or legal error by an arbitrator and will defer to the arbitrator "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987).

Despite this very deferential standard of review, an arbitrator's decision may be vacated under a limited set of circumstances. As the Fourth Circuit has explained, three grounds will support vacating an arbitrator's award: "[I]f it violates clearly established public policy, fails to draw its essence from the collective bargaining agreement, or reflects merely the arbitrator's personal notions of right and wrong." *Champion Int'l Corp. v. United Paperworkers Int'l Union*, 168 F.3d 725, 729 (4th Cir. 1999). Dickenson-Russell raises all three grounds here.

Dickenson-Russell first argues that the Award does not draw its essence from the collective bargaining agreement because the "zero-tolerance" Drug Policy, read in the context of the past practice of terminating employees who tested positive for drugs, required termination for Gilbert's positive test. The Award requiring reinstatement was, therefore, beyond the bounds of the arbitrator's authority and rather an imposition of his personal brand of industrial justice. The problem for Dickenson-Russell, of course, is that the language of the Drug Policy, despite the use of the general term "zero tolerance," states that an employee who

violates it will be subject "to disciplinary action up to and including suspension with intent to discharge." Moreover, the Wage Agreement itself requires just cause for any disciplinary action. The arbitrator found such language to be clear and unambiguous in allowing for a range of discipline for Drug Policy violations and requiring any action to be supported by just cause. He concluded that the term "zero tolerance" was "not synonymous with a requirement that the Company terminate every employee who violates the Policy, no matter the circumstances. It only means that the Company [will] not tolerate drug use without imposing a form of discipline." (Award 24.) This fact distinguishes the situation from *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union*, 76 F.3d 606, 609 (4th Cir. 1996), in which the company's policy stated that an employee who tested positive for drugs would be promptly discharged.

The arbitrator took account of Dickenson-Russell's assertion that its past practice informed the understanding of the zero-tolerance policy but found the clear language of the contract controlled.[8] *See CSX Transp., Inc. v. United Transp. Union*, 29 F.3d 931, 936 (4th Cir. 1994) (stating that "[i]f the parties' written

---

[8] Dickenson-Russell also argues that the Union waived any argument over its interpretation of the Drug Policy as requiring termination when it failed to bring three prior discharges to arbitration. The Union contends that it did not waive its objections to the application of the Drug Policy and notes that it brought at least one other termination under the same policy language, albeit from another mine operation, to arbitration. Dickenson-Russell has presented no facts about the three prior cases. Because there could be any number of reasons the Union decided not to arbitrate those cases, I do not find any such waiver.

agreement is ambiguous or silent regarding the parties' intent, the arbitrator may use past practices and bargaining history to 'fill a gap' in the written contract."); s*ee also Alliant Ammunition & Powder Co. v. Local 8-00495 of United Steel Workers Int'l Union*, 685 F. Supp. 2d 591, 597 (W.D. Va. 2010) (upholding arbitrator's determination that language of the contract was clear and unambiguous and therefore company's past practice did not result in a contrary interpretation). The arbitrator then assessed the mitigating circumstances of Gilbert's case and concluded that there was just cause to support a discipline of suspension without pay. It cannot be said that the arbitrator's interpretation does not draw its essence from the contract. *See Westvaco Corp. v. United Paperworkers Int'l Union,* 171 F.3d 971, 973, 975 (4th Cir. 1999) (holding that arbitrator's decision to modify employee's punishment for sexual harassment from discharge to nine months suspension was permissible where the company's policy stated that employees engaging in sexual harassment were subject to punishment "up to and including termination.").

Dickenson-Russell next argues that the Award violates public policy because it requires Dickenson-Russell to reinstate an employee who tested positive for drugs. The public policy exception to the deferential review of arbitration decisions is very narrow. *See Misco*, 484 U.S. at 43; *see also Westvaco Corp.*, 171 F.3d at 976. The exception is limited to situations where "the contract as

interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Misco*, 484 U.S. at 43 (internal quotation marks and citations omitted).

In support of its argument, Dickenson-Russell cites Virginia law requiring coal operators to enact substance abuse screening policies that provide for pre-employment drug testing. Va. Code Ann. § 45.1-161.87(D) (Supp. 2011). The statute also states that a "mine operator may implement a more stringent substance abuse screening policy and program." *Id.* The statute further provides:

> The operator . . . shall notify the Chief [of the Division of Mines of the Department of Mines, Minerals and Energy] . . . within seven days of (i) discharging a miner due to violation of the company's substance or alcohol abuse polices, (ii) a miner testing positive for intoxication while on duty status, or (iii) a miner testing positive as using any controlled substance without the prescription of a licensed prescriber. An operator having a substance abuse program shall not be required to notify the Chief under subdivision (iii) unless the miner having tested positive fails to complete the operator's substance abuse program. . . . Notice shall result in the immediate temporary suspension of all certificates held by the applicant, pending hearing before the Board of Coal Mining Examiners.

Va. Code Ann. § 45.1-161.87(F) (Supp. 2011). On this basis, Dickenson-Russell asserts a "well-defined and dominant" public policy against the reinstatement of a miner who tested positive for drugs.

The mining industry, as other parts of our society, doubtless faces a significant problem with drug abuse. There is certainly a public policy against the use of drugs in the mines, particularly in safety-sensitive positions. However, the public policy articulated in Virginia law does not go so far as to require termination of every individual who tests positive for drugs or alcohol. The statute provides for *temporary* suspension of the miner's certificates on notice that he or she tested positive for controlled substances. As happened in Gilbert's case, those certificates may be reinstated after a hearing and depending on the outcome of further drug tests.

In *Eastern Associated Coal Corp. v. United Mine Workers, Dist. 17*, 531 U.S. 57, 65 (2000), a truck driver was discharged after testing positive twice for marijuana. The arbitrator, after finding that the employer had not sufficiently shown just cause for the discharge, ordered the employee reinstated after suspension without pay. The employer challenged the award, arguing that it violated the public policy against the operation of dangerous machinery by workers who test positive for drugs. *Id.* at 60. In its opinion, the Supreme Court reinforced the narrowness of the public policy exception to the deferential review of an arbitrator's decision. It found that the law cited by Eastern, the federal Omnibus Transportation Employee Testing Act of 1991 ("Transportation Employee Testing Act"), 49 U.S.C.A. §§ 31306, 31310 (West 2007), and its associated regulations,

did not "forbid an employer to reinstate in a safety-sensitive position an employee who fails a random drug test once or twice." *Eastern Associated Coal Corp.*, 531 U.S. at 65. Rather, that law articulated not only a policy against drug use by employees in safety-sensitive positions and in favor of drug testing, but also a policy favoring rehabilitation. The Court further noted that everything must be assessed in the context of the "background labor law policy that favors determination of disciplinary questions through arbitration when chosen as a result of labor-management negotiation." *Id.* The Court upheld the arbitrator's award.

Dickenson-Russell argues that *Eastern Associated Coal Corp.* does not apply to this case because the Transportation Employee Testing Act had a strong focus on rehabilitation, unlike Virginia law.

While the Virginia statute may not have as strongly articulated a focus on rehabilitation, the statute refers to employer rehabilitation programs and mitigates its force where those programs are in place. The statute indicates a preference for rehabilitation and treatment both by allowing for reinstatement of certificates and by indicating that a coal operator with a substance abuse program must notify the Board of Coal Mining Examiners if the miner fails to complete a substance abuse program. A miner who does complete a company sponsored substance abuse program will not lose mining certificates and, indeed, the Board will know nothing about the issue.

I find that the Award does not violate any well-defined and dominant public policy.

### III

The Union seeks attorneys' fees, claiming that Dickenson-Russell lacked justification for its refusal to abide by the Award and the Supplemental Award.[9] Although the American Rule requires each party to bear its own attorneys' fees, there are limited exceptions. *See United Food & Commercial Workers, Local 400 v. Marval Poultry Co.,* 876 F.2d 346, 350 (4th Cir. 1989). Attorneys' fees may be awarded against a party "'who, without justification, refuses to abide by the award of an arbitrator.'" *Id.* (quoting *Local No. 149 Int'l Union, United Auto. Workers v. Am. Brake Shoe Co.*, 298 F.2d 212, 216 (4th Cir. 1962)).

In order to allow the parties to fully advise the court as to the request for attorneys' fees in light of the court's opinion on the merits, and in accord with Federal Rule of Civil Procedure 54(d)(2), I will permit the Union to file a motion for attorneys' fees within 14 days after the entry of judgment, conforming to Rule 54(d)(2)(B). If no such motion is filed, the court will assume that attorneys' fees are not requested.

---

[9] Dickenson-Russell does not challenge the Arbitrator's retention of jurisdiction and Supplemental Award.

IV

The Union also requests an award of interest on the back pay to which Gilbert is entitled. "The granting of prejudgment interest from the date of the arbitrator's award in an action seeking to confirm that award is a question of federal law entrusted to the sound discretion of the district court." *United Food & Commercial Workers, Local Union No. 7R v. Safeway Stores, Inc.*, 889 F.2d 940, 949 (10th Cir. 1989). The court should "weigh the equities in a particular case to determine whether an award of prejudgment interest is appropriate." *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 727 (4th Cir. 2000).

The equities in this case support an award of interest. Gilbert has undoubtedly suffered financial hardship from Dickenson-Russell's refusal to abide by the Award. While the arbitrator found that a suspension until April 11, 2011 – approximately six months – was justified, Gilbert's wage loss from Dickenson-Russell has been nearly 15 months so far because of Dickenson-Russell's rejection of the Award.

The rate of prejudgment interest to be awarded is also at the discretion of the court. *See Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1030-31 (4th Cir. 1993) (citing *United States v. Dollar Rent A Car Sys., Inc.*, 712 F.2d 938, 940 (4th Cir. 1983)). Here, I find that the appropriate rate of interest is six percent, as set forth in Virginia's judgment interest statute, Va. Code Ann. § 6.2-302(A) (2010).

This rate properly compensates Gilbert under the circumstances. *See City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995) ("The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss.").

V

For the reasons stated, I will deny Dickenson-Russell's Motion for Summary Judgment, grant the Union's Motion for Summary Judgment, and direct enforcement of the Award and Supplemental Award.

A separate final judgment will be entered forthwith.

DATED: January 3, 2012

/s/  James P. Jones
United States District Judge